IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Criminal Action No. 04-cr-00180-WDM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GWEN BERGMAN,

      Defendant.

_____

**FINDINGS AND CONCLUSIONS CONCERNING RETROSPECTIVE COMPETENCY**
_____

      This matter is before me pursuant to the remand order of the United States Court

of Appeals for the Tenth Circuit in *United States of America v. Bergman*, 599 F.3d 1142

(10th Cir. 2010).  Following various hearings, including a two-day hearing consisting of

the testimony of four expert witnesses, as well as review of the file and arguments of

counsel, I make (or take judicial notice of) the following findings of fact:

<u>Background and Findings of Fact</u>

      1.  As the Court of Appeals observed in March of 2010, the Defendant, Gwen

Bergman ("Defendant"), "has had a long and complicated history" before this Court and

the Court of Appeals.  599 F.3d at 1145.  The past year has only increased its length

and complexity.  I include much of this history as part of my findings to provide context

and background for my conclusions.

      2.  The evidence at trial established that the Defendant sought to hire individuals

to murder John LaCouture, the father of Defendant's child, after losing a bitter custody

dispute with Mr. LaCouture.

3.   Defendant was initially arrested upon a complaint and then, on April 30, 2004,

charged by Information with interstate transportation or use of the mail to commit a

crime of violence in violation of 18 U.S.C. § 1952(a). ECF No. 10.

4.   Defendant retained an experienced attorney to defend against those charges,

E. Richard Toray, of the firm of Gerash, Steiner and Toray, P.C.

5.   After plea negotiations a notice of disposition was filed.  Pursuant to the plea

agreement, a superseding information was filed which was limited to non-violent

charges, in particular, 18 U.S.C. § 1952(a)(1) and (3).  ECF No. 15.  As a consequence

a maximum period of imprisonment was five years. 18 U.S.C.

§ 1952(a)(3)(A).

6.   At a scheduled sentencing on November 12, 2004, I expressed concern

whether the prosecution's charges adequately reflected the seriousness of the actual

offense behavior.  I asked the parties to present their views whether I had the authority

to decline to accept the plea agreement because of inadequate charges.  ECF No. 27.

7.   In accordance with the authority submitted by the government (ECF No. 30), I

accepted the plea agreement and sentenced the Defendant to the statutory maximum of

60 months imprisonment, followed by three years of supervised release.  I

recommended that the Defendant be placed at a facility where mental health care was

available.  (ECF No. 37).

8.   Defense counsel Toray made no suggestion of incompetency on the part of

Defendant.  He and his firm were allowed to withdraw on January 11, 2005, and the

Federal Public Defender was appointed in their stead.  ECF No. 54.

     9.    After sentencing and during the appeal process, Defendant commenced her

practice of filing numerous motions and other matters as well as filing numerous notices

of appeal, which continues unabated through today.

     10.   A notice of appeal was filed on behalf of Defendant on January 20, 2005.

Initially, her counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967),

stating that Defendant didn't challenge her conviction and that appeal of her sentence

had no merit.  However, acting *pro se*, Defendant challenged her conviction and the

government ultimately agreed that the admitted facts of the plea agreement did not

satisfy the elements of 18 U.S.C. § 1952(a)(1) and (3).  Accordingly, the Court of

Appeals vacated the conviction and remanded the matter to this court for further

proceedings.  *United States v. Bergman*,191 Fed. Appx. 762 (10th Cir. 2006).  Mandate

issued on September 13, 2006.  *See* ECF No. 105.

     11.   On the same date the Defendant was indicted for use of interstate

commerce and mails in the commission of murder for hire in violation of 18 U.S.C.

§ § 1958(a) & (b) and 2 (Count 1) and conspiracy to commit murder for hire as charged

in Count 1 (Count 2).  ECF No. 106.

     12.   In accordance with the opinion of Karen Fukutaki (ECF No. 216),

Defendant's counsel, <u>over the Defendant's objection</u>, moved on October 18, 2006, for a

determination of her competency.  ECF No. 121.

     13.   At the same time, and pursuant to Defendant's request, Defendant's counsel

moved to withdraw as attorney and to allow Defendant to proceed *pro se* or for

3

appointment of counsel from the Criminal Justice Act ("CJA") panel.  ECF No. 123.

14.  Following hearing in November 2006, it was determined that the competency issue should be addressed prior to deciding whether counsel may withdraw and that a special counsel should be appointed to defend the Defendant in the competency matter. ECF No. 146.  Martha Eskesen of the CJA panel was appointed as that special counsel. ECF No. 143.

15.  In January 2007, and pursuant to Defendant's motion, I authorized the psychiatric examination of the Defendant by Dr. Susan Bograd.  ECF No. 172.  She submitted a report on February 12, 2007.  ECF No. 217.

16.  On February 22, 2007, a competency hearing was held at which Drs. Fukutaki and Bograd and the Defendant testified.  Defendant was represented by Edward Pluss of the Federal Public Defender and special counsel Eskesen.  Both experts opined that Defendant met the first prong of the competency statute–that she understood the proceedings against her, but failed the second prong as she could not properly assist counsel.  *See* 18 U.S.C. § 4241(a).  After consultation, Defendant testified that she was competent, in particular that she could assist counsel and accept different views of the case.  Feb. 22, 2007 Transcript, ECF No. 212, at p. 8.  At the close of the hearing, I concluded that the Defendant was not competent to stand trial and remanded her to the custody of the Attorney General for up to four months pursuant to 18 U.S.C. § 4241(d).  *See* March 6, 2007 order, ECF No. 194.

17.  Defendant was then transferred to the Federal Medical Center Carswell in Fort Worth, Texas ("Carswell") for hospitalization to restore her competence.

18.  The Defendant, acting through the Federal Public Defender, filed a notice of

4

appeal on March 7, 2007 to appeal my order determining she was presently incompetent to stand trial.  ECF No. 195.

19.  On June 11, 2007, Trent H. Evans, Ph.D., a forensic psychologist at Carswell, submitted a forensic evaluation that Defendant remained incompetent.  The psychologist opined, however, that,  if administered psychotropic medication, there was "a substantial probability she will obtain the capacity to permit the trial to proceed if she receives appropriate psychiatric treatment."  Forensic evaluation, ECF No. 230, p. 6. This report was transmitted by facsimile to me on July 3, 2007 and I directed its e-filing on the same date to all counsel.  *Id.*

20.  Defendant resisted the medication and on July 31, 2007, the government filed a motion to authorize the involuntary administration of psychotropic medication. ECF No. 235.  By response filed the same day, the Defendant opposed the motion. ECF No. 236.

21.  A status conference on the motion was held on August 1, 2007.  Special counsel Eskesen was excused from her representation of the Defendant, given her representation by the Federal Public Defender.  Counsel were directed to set a hearing on the government's motion.  ECF No. 241.

22.  A hearing on the motion for forced medication was set by counsel for October 23, 2007.  ECF No. 238.

23.  On October 9, 2007, Howard O. Kieffer entered his appearance on behalf of Defendant "as a member of the bar of this Court."  ECF No. 246.

24.  Although he was indeed admitted to the bar of this Court, he is not an attorney and was not qualified to be a member of any bar.

25.  On the same date, and based upon the belief that Mr. Kieffer's entry of appearance was genuine, the Federal Public Defender again moved to withdraw.  ECF No. 247.  The motion was granted.  ECF No. 248.

26.  On October 16, 2007, the government sought to withdraw its motion to force medication because it had been advised by staff at Carswell that it believed Defendant competent to proceed without forced medication.  ECF No. 250.

27.  On October 18, 2007, the court received a copy of a forensic valuation, dated October 17, 2007 from Robert E. Gregg, Ph.D. opining that Defendant was competent.  ECF No. 517.  Specifically Dr. Gregg concluded:

> In my professional opinion, though she continues to suffer from mental illness, Ms. Bergman is currently competent.  She has recovered sufficiently from a severe mental disease or defect such that she is able to understand the nature and consequences of the proceedings against her and is able to assist properly in her defense.

*Id.* at p. 3.

28.  On October 23, 2007, the scheduled hearing on forced medication was convened.  The parties discussed the Gregg report and whether the court had jurisdiction to proceed given the Defendant's pending appeal.  Kieffer advised that, given the Gregg opinion, the notice of appeal was moot and he would withdraw it.  The hearing was continued until 3:00 p.m. that afternoon at which time Kieffer submitted a copy of the Defendant's motion to withdraw the appeal and the hearing proceeded thereafter.  Counsel for both parties declined to present any further evidence concerning the Defendant's competency besides the report of Dr. Gregg.  Both counsel joined in the request that the decision be made on the basis of the Gregg report.  I did so conclude as follows:

6

> I have received and reviewed the forensic evaluation of the Defendant submitted by Robert E. Gregg, Ph.D., that in his opinion the Defendant continues to suffer from mental illness but is currently competent with the proviso that she–her circumstances fragile and that it's recommended that her stay at the Carswell facility continue until required for court appearances and that the highly structured hospital environment has contributed to their findings. . . .
>
> My intent to speak plainly is to conclude based upon the record that she would be competent to proceed to trial today.  I don't know whether she would be a month or two months without continuing supervision and care at Carswell facility, and it's my intent to provide for the reality of her circumstances and the strictures of the language of § 4241.

Reporter's transcript of October 23, 2007 Transcript, ECF No. 518, at pp. 18-19.

29.  The Court of Appeals did dismiss the appeal.  *See* Mandate, ECF No. 254.

30.  At the same October 23, 2007 hearing, Defendant requested rearraignment in order to plead guilty.  However, when asked during the Rule 11 plea colloquy whether she admitted the allegations of the intent to murder John LaCouture, Defendant refused to agree despite repeated efforts by me and presumed counsel Kieffer.  *See* Transcript, ECF No. 518, at pp. 32-38.  As a consequence, I refused to accept her plea.

31.  On November 20, 2007, a jury trial was set for May 5, 2008.  ECF No. 268.

32.  On December 3, 2007, the Superseding Indictment as to the Defendant was issued.  ECF No. 271.  Defendant was rearraigned on December 21, 2007, ECF No. 277.

33.  On the same date Defendant again sought to enter a plea of guilty without admitting essential elements of the offense and I again refused to accept the plea.  ECF No. 284.

34.  On the eve of trial, Kieffer declared the Defendant's intent to waive the jury.  ECF No. 338.  On May 5, 2008, following a colloquy with me, Defendant waived a jury.

7

ECF No. 339.

35.   Following conclusion of trial, on May 9, 2008, I stated my findings and conclusions and a verdict was signed finding Defendant guilty on Counts 1 and 2.  ECF No. 344-1.

36.   E.J. Hurst participated throughout trial as co-counsel with Kieffer and entered his formal appearance on June 13, 2008.  ECF No. 352.

37.   Upon being advised of Kieffer's fraud, I entered an order notifying the parties I was considering a mistrial pursuant to Fed. R. Crim P. 26.3 and sought their views on such action.  ECF No. 364.

38.   E.J. Hurst filed a response without requesting a mistrial and indicated a willingness to represent the Defendant.  ECF No. 374.  The government likewise did not request a mistrial and rather suggested that the appropriate procedure would be to grant a new trial pursuant to Fed. R. Civ. P. 33 "if the interests of justice so requires." ECF No. 376.  No request for mistrial or a new trial was made by counsel for either party.

39.   In August of 2008 attorney Hurst moved to withdraw because of conflicts of interest.  ECF Nos. 388 & 398.  Following reappointment of attorney Eskesen and entry of her appearance (ECF No. 395), I granted attorney Hurst's motion to withdraw.  ECF No. 399.

40.   Attorney Eskesen did not seek a mistrial, new trial or a competency determination and the matter proceeded to sentencing on November 26, 2008.  ECF No. 435.  Defendant was sentenced to 108 months as to each count, to be served concurrently, to be followed with 3 years of supervised release.  Amended judgment,

ECF No. 442.

41.  In response to defense counsel's arguments concerning possible departures related to Kieffer's fraud, I noted that, given his apparent familiarity with the law, he had everyone in the courtroom believing he was an attorney.  November 26, 2008 Transcript,  ECF No. 440, at p. 12.  I observed things that one could question but that was no "different than any other trial that I've conducted [where] without exception I would second-guess attorneys for both sides in things they did or didn't do during trial. And also during the trial, there was an attorney assisting in that trial and present during the trial so that I'm left with the overall conclusion that I saw nothing where the representation was so deficient that I would question the ultimate result."  *Id.* at pp. 11-12.

42.  As the Court of Appeals directed, the issue of ineffective assistance of counsel is more appropriately brought in a collateral proceeding.  *Bergman*, 599 F.3d at 1149.

43.  Defendant was remanded to the custody of the Bureau of Prisons which returned her to Carswell where she has, with few exceptions, remained.

44.  The Defendant appealed and the Court of Appeals, although deciding the sentence imposed was reasonable, determined that Defendant's Sixth Amendment right to counsel at the October 23, 2007 competency hearing was violated by Kieffer's fraud, in effect denying her counsel.  599 F.3d at 1148.  Absent a determination that Defendant stood trial while incompetent, the Court of Appeals remanded the case to this court

to determine whether it can make a retrospective competency determin-

ation. . . . If it is not able to make a retrospective competency determin-
ation, or of the court determines it can make a retrospective competen-
cy determination and it concludes that Bergman was incompetent, it
must vacate the judgment, hold a hearing to determine Bergman's
current competency status–at which she must be represented by
counsel–and proceed to trial when she is competent.  On the other
hand, if it concludes that Bergman was competent in October 2007,
the court may still, in its discretion, vacate Bergman's conviction and
conduct a new trial.

*Id.* at 1148-49.

45.  Following the issue of a mandate on May 12, 2010 (ECF No. 504) attorney

Eskesen was allowed to withdraw and CJA counsel Daniel Smith was appointed.  ECF

No. 510.

46.  Following discussions of counsel, I concluded that the best procedure would

be to first determine whether I am able to make a retrospective competency

determination.  If I were to so conclude, the next step would be to determine whether

Defendant was currently competent to understand the proceedings and assist counsel,

and, if so, finally determine whether the Defendant was competent in October of 2007.

47.  On September 15, 2010, Defendant submitted its statement that I could

make that determination, supporting it with Susan Bograd, M.D.'s September 3, 2010

report which concluded "with a reasonable degree of medical certainty that a

retrospective competency to proceed evaluation can be performed in this case and that

an opinion can be reached with a reasonable degree of medical certainty as to whether

or not [defendant] was competent to proceed on October 23, 2007."  ECF No. 549-1 at

p. 6.

48.  A hearing was held on October 5, 2010 at which an electronic form of

Defendant's file from Carswell and Dr. Bograd's report were received as Exhibits A and

B.  Following consideration of the record, exhibits and counsel's arguments, I analyzed the issue of restrospective competency under the standards of *Drope v. Missouri*, 420 U.S. 162, 183 (1975), and concluded that I could make such a retrospective determination.  Although three years have passed, extensive medical records were available as well as prior competency determinations, numerous statements by Defendant existed in the record and both expert and non expert witnesses were available in making the determination.  Courtroom minutes, ECF No. 556, at p.2.

49.  Pursuant to Defendant's request, a current competency evaluation was ordered, conducted and submitted on November 8, 2010, by forensic psychologist Christine Anthony, Ph.D.  Her conclusion was that Defendant was presently competent to stand trial.  Dr. Anthony stated that Defendant does have a mental illness but is "fully aware of the nature and potential consequences of her legal case.  She is also capable of properly assisting in her defense."  ECF No. 562, at p. 10.

50.  The issues proceeded to hearing on January 12 and 13, 2011.  Drs. Anthony, Gregg, Evans, Cherry and Bograd were called in that order.  All were offered and accepted as experts qualified to render their opinions.  Numerous exhibits were admitted.  *See* ECF Nos. 586 and 588.

51.  Following the testimony of Dr. Anthony and review of her November 2, 2010 forensic evaluation, I found and concluded that Defendant does suffer from mental disease.  Nevertheless, the government did prove by a preponderance of the evidence that the mental disease does not render her unable to understand the nature and consequences of the proceedings or to assist in her defense.  Neither party advocated otherwise.  With that finding of current competency, the matter proceeded to the issue

11

of whether Defendant was competent in October of 2007.  ECF No. 586 at p. 2.

52.   The government then called Dr. Gregg, the chief psychologist at Carswell, who has had substantial contact with Defendant, beginning in early 2007 and continuing until today.  He reviewed Dr. Evans' June 11, 2007 forensic evaluation concluding that Defendant was incompetent, authored the October 17, 2007 forensic evaluation concluding that Defendant had recovered sufficiently to be competent and reviewed the November 2, 2010 forensic evaluation by Dr. Anthony that Defendant was competent to stand trial and participate in the retrospective competency determination.  As such, Dr. Gregg had more personal contact to observe and interact with the Defendant than any of the other testifying experts.

53.   Dr. Gregg explained the "treatment team" approach used with patients at Carswell.  The team consisted of a psychologist (initially Dr. Evans), a psychiatrist (initially Dr. Gonzales), together with social workers, recreation specialists, psychiatric nurses, and occasionally a correctional officer.  January 12, 2001 Transcript, ECF No. 586 at p. 52.  This team recommended the administration of antipsychotic medicine in an effort to restore the Defendant's competency.  The Defendant took it once, asserted an extreme reaction and refused to take it thereafter.  This resulted in the recommendation to seek forced medication.

54.   Shortly after authoring the June 11, 2007 report, Dr. Evans transferred from Carswell to Washington, D.C.  His departure was followed by Dr. Gonzales who had transferred to another facility a month or two later.  As supervisors, Dr. Gregg replaced Dr. Evans as the Defendant's team psychologist and Dr. Cherry replaced Dr. Gonzales as the team psychiatrist.

12

55.   As the summer progressed, Dr. Gregg noticed changes in Defendant's condition.  She became more cooperative and involved in various programs.  She became less paranoid over the summer, more willing to talk with others and participate in on-going life at Carswell, including educational programs.  Dr. Gregg linked these changes to the departure of Dr. Evans and Dr. Gonzales whom the Defendant believed were trying to poison her with the antipsychotic medication.

56.   In late September or early October, Dr. Gregg undertook a formal competency examination, involving at least two meetings with the Defendant. Defendant continued to assert she was fully competent.  A formal evaluation of the Defendant known as ECST-R was conducted.  This evaluation is commonly used to determine a person's competence for trial.  Defendant's responses fell within the normal range indicating full competence.  January 12, 2011 Transcript, ECF No. 586, at p. 61. He also consulted with other members of the "treatment team."

57.   Dr. Gregg determined that the Defendant had no impairment at all with respect to the first prong of the competency determination, understanding the nature of the proceedings.  His primary focus was on the second prong, assisting her attorney. Dr. Gregg found that, as opposed to her status in June of 2007, there was an absence of the paranoia concerning the legal system, she was able to concentrate and pay attention in a conversation, she did not misinterpret information and was able to accept a different perspective without becoming argumentative.  January 12, 2011 Transcript, ECF No. 586, at p. 69.

58.   Based upon his observations, consultations, testing and interviews, Dr. Gregg rendered his October 23, 2007 competency opinion and, based upon his ongoing

13

observations of the Defendant at Carswell since that time, he continues to conclude she is competent.  January 12, 2011 Transcript, ECF No. 586, at p. 73.

59.  Upon cross-examination, Dr. Gregg acknowledged that he had not reviewed the evaluations of Drs. Bograd and Fukutaki.  He has also been unable to locate his personal notes of his interviews with the Defendant or her attorney.  Cross-examination also demonstrated that the records that did exist indicated that the treatment team continue to seek a court order for forced medication and indicated that the Defendant's status had not changed, with notations in August and later that she remained paranoid and delusional.  Dr. Gregg acknowledged that the Defendant did have mental illness but had improved to the point that she understood the criminal process and could assist her attorney, concluding that the Defendant's persistence in her story was similar to thousands of other defendants he has seen over the lengthy term of his employment at Carswell.

60.  Like Dr. Gregg, Dr. Cherry has observed Defendant since she first came to Carswell, first as the supervisory psychiatrist of Dr. Gonzales and then as the treating psychiatrist after Dr. Gonzales left.

61.  Like Dr. Gregg, Dr. Cherry also observed changes in the Defendant's personality and actions.  Initially she had been quite suspicious and then became willing to discuss matters.  She became more participatory in activities and more involved in her competency restoration.  "She became much more relaxed and the suspiciousness and paranoia that she exhibited previously was relatively absent.  So it was a fairly profound change.  She also seemed to be enjoying what she was learning in competency restoration and enjoyed her role.  She was very good at it.  She was very

14

knowledgeable about the law.  So that was quite different." January 12, 2011

Transcript, ECF No. 586, at p. 156.

62. Upon cross-examination Dr. Cherry acknowledged that she did tell Dr. Gregg

in October that the administration of medication would not assist the Defendant after the

record previously had indicated it was her recommendation.  She also acknowledged

that the medical records available did not disclose any alteration in the recommended

psychotropic medication.

63. Dr. Evans was called as a defense witness.  Although he had not seen the

Defendant since June of 2007, he had reviewed the available record.  He opined that

the only way to restore the Defendant's competency was the administration of the

medication.  He saw no evidence of any other treatment in her file that would cause

change to her mental status without medication.

64. The Defendant also called Dr. Bograd.  Like Dr. Evans, Dr. Bograd had not

seen or observed the Defendant since 2007 but had reviewed the records.  She agreed

with the diagnosis of Drs. Evans and Gonzales and with their recommended treatment.

Given the absence of the administration of medication Dr. Bograd opined that

Defendant remained incompetent and cited as an example the Defendant's apparent

inability to admit an intent to hire someone to murder Mr. LaCouture.

65. Upon cross-examination, Dr. Bograd suggested that her opinion that the

Defendant would not be restored to competency without medication could be reconciled

with the opinion of others that she was currently competent by applying different

standards at different stages of legal proceedings.

Conclusions and Order

15

Based upon the foregoing and the record of these proceedings, I make the following conclusions and orders:

1.  Having determined that Defendant was not competent in February 2007, the burden is upon the government to prove by a preponderance of the evidence that her competence was restored in October 2007, and thereafter for the May 2008 trial.  18 U.S.C. § 4241(e).

2.  The conflicting expert opinions are resolved in favor of Drs. Gregg and Cherry that Defendant's competency was restored in October 2007.  They were the only qualified experts who observed and treated the Defendant on a continuous basis from the initial determination of incompetency until the present.  They agreed with other experts that she was incompetent in early 2007 but provided rational reasons to conclude that her competency was restored by October 2007.  This opinion is consistent with the opinion of Dr. Anthony that Defendant was competent in November 2010.  The countervailing opinions of Drs. Evans and Bograd that she remained incompetent in October 2007 and thereafter are given less weight.  Their opinions are devoid of any personal observation or interaction with Defendant since early 2007 and are apparently tied to the belief that restoration was not possible without medication.  An opinion on competency without current observations or examinations is necessarily less meaningful than one with the benefit of such observance and examination with the latter being more consistent with the mandates of 18 U.S.C. § 4241(b).  The same standard of competency applies to each stage of the proceeding and an opinion of incompetency cannot be reconciled with an opinion of current competency simply because the question is asked at a different stage of the proceeding.

16

3.   The actions of the various defense attorneys in the continuum of this action tend to confirm the expert opinions of Drs. Gregg, Cherry and Anthony of competency. It is well established that defense counsel, as officers of the court, have an on-going duty to raise the competency issue.  *United States v. Boigegrain*, 155 F.3d 1181, 1188, (10th Cir. 1998).

> Of all the actors in a trial, defense counsel has the most intimate association with the defendant.  Therefore, the defendant's lawyer is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand the proceedings against them, she has a professional duty to do so when appropriate.

*Id.*

I assume all defense counsel were well aware of this duty.  Mr. Toray represented Defendant through the first plea and sentencing without raising the issue.  Upon remand, the public defender raised the issue, against the will of Defendant, and separate counsel, Ms. Eskesen, was appointed to represent her on the competency issue.  Upon the unanimous expert recommendations she was found incompetent. Then, upon the recommendation of Drs. Gregg and Cherry she was found competent, albeit without representation because of the Kieffer fraud.  Trial proceeded with Mr. Hurst as co-counsel and Eskesen was appointed for purposes of sentencing after discovery of the fraud.  Neither raised the issue of competency.  Upon appointment of Mr. Smith following the second remand, he raised the issue of current competency which was resolved in favor of competency without contest.  I also note that no counsel has ever raised the issue of insanity at the time of the offense.  Assuming each defense counsel performed his or her duty, I infer the Defendant was competent at the time of the offense, at the time of the original plea and sentencing, but not following remand

17

until her competence was restored in October 2007, which has continued to the present through on-going care at the Carswell facility.

4.   Having periodically observed, spoken with and heard the defendant over the years, as well as reviewing numerous *pro se* pleadings and communications, I have never seen the Defendant when she was not actively engaged in the proceedings and conversing with counsel.  By all her observable actions she has repeatedly demonstrated an understanding of the nature and consequences of the proceedings and the ability to assist counsel, albeit with the burden of Defendant's misguided beliefs of what the law should be.  Defendant is intelligent with a fulsome determination to prevail.

5.   For the foregoing reasons, and although reasonable doubt exists, I conclude that the government proved by the preponderance of evidence that Defendant's mental condition was so improved in October of 2007 that she was mentally competent to proceed to trial in that she was able to understand the nature and consequences of the proceedings against her and to properly assist in her defense at trial.  Given her on-going care and treatment at the Carswell facility since that determination, I also conclude that she was competent to stand trial in May of 2008.

6.   She remains competent as of the January 2011 hearing date.

7.   Having retrospectively determined that Defendant was competent at trial, a new trial is not required.  Given the record of this proceeding, in particular the trial record, I conclude there is not sufficient basis for me to *sua sponte* order a new trial without a further showing.  Accordingly,  Defendant is remanded to the custody of the Bureau of Prisons for the completion of her sentence.

DATED at Denver, Colorado, on May 5, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge